UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
JOHN JOSEPH MCCUMBER,               )
        Plaintiff,                  )
                                    )
        v.                          )   CIVIL ACTION
                                    )   NO. 13-11666-TSH
CAROLYN W. COLVIN,                  )
Acting Commissioner of Social Security )
Administration,                     )
                                    )
        Defendant.                  )
_____ )


**MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION TO REVERSE AND REMAND THE DECISION OF THE SOCIAL SECURITY ADMINISTRATION (Docket No. 16) AND DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION (Docket No. 20)**
September 25, 2014

HILLMAN, D.J.

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("SSA") (the "Commissioner") denying John Joseph McCumber's ("Plaintiff") application for Social Security Disability Insurance Benefits. Plaintiff filed a motion seeking an order reversing the decision of the Commissioner (Docket No. 16), and the Commissioner filed a cross-motion seeking an order affirming the decision of the Commissioner (Docket No. 20). For the reasons set forth below, Plaintiff's Motion to Reverse and Remand the Decision of the Social Security Administration is ***granted*** and Defendant's Motion to Affirm the Commissioner's Decision (Docket No. 20) is ***denied.***

## Procedural History

Plaintiff filed an application for disability insurance benefits on February 22, 2010, claiming he has been unable to work since August 31, 2005 because of respiratory and

1

gastrointestinal illnesses. (R. 177, 181). Plaintiff's application was denied on July 7, 2010, and his request for reconsideration was denied on October 28, 2010. (R. 67). On November 30, 2010, Plaintiff timely requested a hearing before an administrative law judge (ALJ). (R. 74). Plaintiff appeared by video hearing before ALJ Addison C.S. Massengill on March 5, 2012. (R. 16). On May 15, 2012, the ALJ issued a decision finding that Plaintiff was not disabled under the Social Security Act. (R. 23). The Appeals Council denied Plaintiff's request for review on May 16, 2013, making the ALJ's decision the final decision of the Commissioner. (R. 1).

## Facts

### *Personal and Employment History*

Plaintiff was 47 years old on his alleged onset date of disability, and 54 years old on the date of his hearing before the ALJ. (R. 156). He graduated from high school in 1976. (R. 182). Plaintiff worked as a forklift operator and warehouse manager at Casey Warehouse in Leominster, Massachusetts from 1979 until 2005. (R. 203). In 2005, Plaintiff discovered that certain materials he handled in the warehouse, described as silicones and aerosols, (R. 31), were hazardous. (R. 50-51). He had worked with the hazardous material for four years without proper equipment. *Id*. Upon making this discovery, Plaintiff went to his employer and insisted that he would no longer handle hazardous materials without proper training and equipment. *Id*. As a result, Plaintiff was fired from his job on August 30, 2005. (R. 30-31, 183). He initially attempted, but ultimately was unable, to find work in the same field. (R. 31). Plaintiff stopped looking for work in 2006 as a result of his worsening medical condition, and supported himself with a $100,000 settlement he received from his former employer. (R. 33).

*Medical History*

Plaintiff has been treated primarily for two impairments: Barrett's Esophagus, or gastroesophageal reflux disease (GERD), and chronic obstructive pulmonary disease (COPD). In addition to medical reports from his gastrointestinal and pulmonary specialists, the record contains reports from Plaintiff's primary care physician and his mental health counselors.

*(1) Records from Elliot Feinberg, M.D.*

Plaintiff was treated by gastroenterologist Elliot Feinberg between 1994 and 2008. In 1994, Plaintiff underwent an upper endoscopy and was diagnosed by Dr. Feinberg with "rather severe" esophagitis and gastritis. (R. 259). He was prescribed Prilosec for two months. *Id*. Plaintiff next returned to Dr. Feinberg in 1998 after complaining of severe reflux symptoms and chest pain. (R. 261) However, a subsequent endoscopy was normal except for "some gastritis." (R. 257). Plaintiff was prescribed Prevacid. *Id.*

Plaintiff next underwent an endoscopy in August 2005. (R. 276) Results were normal, although Barrett's Esophagus was detected and a biopsy of the Barrett's Epithelium was performed. *Id*. Plaintiff was instructed to continue taking Prevacid once or twice a day. (R. 254). In August 2006 Plaintiff underwent an endoscopy/colonoscopy. The endoscopy revealed a "short segment Barrett's epithelium," (R. 250) but otherwise yielded "stable findings." (R. 246). The colonoscopy revealed the presence of multiple large polyps in the colon, which were removed. (R. 250). This finding was concerning enough to Dr. Feinberg that he scheduled Plaintiff for a repeat procedure the following year. *Id*. Plaintiff's repeat colonoscopy was performed in September 2007. (R. 247). The procedure revealed the presence of two small polyps which were removed, and a follow-up colonoscopy was recommended to be scheduled within five years. *Id*. Plaintiff underwent another endoscopy in September 2008. (R. 244). Dr. Feinberg's records

indicate that Plaintiff's Barrett's and GERD symptoms were mostly controlled with Prevacid (R. 246).

*(2) Records from Odalys Croteau, M.D. and Plutarco Castellanos, M.D.*

Plaintiff was treated by pulmonologist Odalys Croteau for his respiratory problems between 2008 and 2010. Records from Plaintiff's January 2008 visit to Dr. Croteau indicate that he had "mild chronic obstructive pulmonary disease" that caused exertional dyspnea (shortness of breath upon exertion). (R. 321). However, the dyspnea was managed with prescription Combivent and an albuterol inhaler. *Id*. Dr. Croteau also observed that Plaintiff's reflux disease was "stable on Prevacid." Plaintiff next saw Dr. Croteau in October 2008. Plaintiff denied having any respiratory symptoms other than his mild exertional dyspnea. (R. 317). Dr. Croteau noted that Plaintiff had just had an endoscopy with Dr. Feinberg and "reportedly everything was just fine." *Id.* Plaintiff continued to manage his COPD and GERD symptoms with Combivent and Prevacid. *Id.* Later that month, Plaintiff underwent a pulmonary function test. (R. 319-20). Dr. Croteau observed there was no evidence of airway obstruction, no restrictive ventilatory defect, no significant change in spirometry, and that Plaintiff's diffusion capacity was within normal limits despite a significant decline of 22% since August 2006. (R. 319). Plaintiff last saw Dr. Croteau in October 2009. Dr. Croteau observed that Plaintiff was "in his usual state of health" and "with the exception of rare exertional dyspnea with over exertion, the patient denies chronic respiratory symptoms." (R. 315).

Plaintiff began seeing a new pulmonologist, Dr. Plutarco Castellanos, in August 2010. Notes from the initial evaluation described Plaintiff's COPD and shortness of breath as intermittent with moderate severity. *Id*. The symptoms were aggravated by climbing stairs and humidity. *Id*. Dr. Castellanos noted that Plaintiff's lung respiratory rate was normal, percussion

was normal bilaterally, and breath sounds were clear bilaterally. (R. 342). He continued Plaintiff on his Combivent prescription, and started a prescription for Symbicort. *Id*. Plaintiff saw Dr. Castellanos for a follow-up visit one month later. Plaintiff reported that his chest congestion, shortness of breath, and nasal congestion were all improving as a result of cooler weather. (R. 344). (R. 344-45). Dr. Castellanos observed that Plaintiff's "COPD is mild so he will continue the intermittent use of Combivent as needed." (R. 345). The prescription for Symbicort was discontinued because Plaintiff "did not tolerate" the medication. *Id.* Also contained in the September 2010 report is Dr. Castellanos' review of Plaintiff's pulmonary function test results, administered on September 15, 2010. Dr. Castellanos observed that the spirometry, lung volumes, and diffusion capacity were all within normal limits. *Id.* The report noted, however, that "ATS criteria was not met on spirometry and methacholine test could not be done." Dr. Castellano next examined Plaintiff in January 2011. (R. 375). Plaintiff stated that since the last visit, his chest congestion was improving, but shortness of breath, nasal congestion, and wheezing were all worsening. *Id*. Exacerbating factors appeared to be the change of season and exposure to allergens. *Id*. Dr. Castellanos continued Plaintiff's prescription for Combivent. (R. 376).

Dr. Castellanos submitted a letter for the record dated November 28, 2011, expressing the opinion that Plaintiff's symptoms are consistent with "moderate chronic obstructive lung disease and chronic rhinitis," and given Plaintiff's inability to tolerate prescribed medications, "his chronic complaints have led chronic inactivity and poor functional status."

*(3) Records from Edward Kamens, M.D.*

The record contains reports of Plaintiff's regular examinations by his primary care physician, Dr. Edward Kamens, from 2005 through 2010. A report from May 2005, three months

before the alleged onset of disability, indicates that Plaintiff's physical examination was completely normal. (R. 294). Reports of examinations from February 2009, March 2010, July 2010, and November 2010 acknowledge Plaintiff's COPD and GERD and his prescriptions for Combivent and Prevacid, but are otherwise illegible. (R. 294, 292, 290-91, 361-66).

Dr. Kamens also completed two medical questionnaires that are in the record. In a questionnaire dated March 17, 2010, Dr. Kamens diagnosed Plaintiff's respiratory impairments as chronic dyspnea and allergic rhinitis, and stated that Plaintiff experienced exertional dyspnea with overexertion. (R. 324). Dr. Kamens indicated that Plaintiff's respiratory symptoms had a "good response" to the Combivent and Albuterol. (R. 325). Dr. Kamens diagnosed Plaintiff's digestive disorder as "short segment Barretts epithelium, GERD." (R. 326). Dr. Kamens indicated that Plaintiff was prescribed Prevacid to manage his gastrointestinal problems, and that the prognosis was "stable." *Id.* Dr. Kamens left blank the space requesting an opinion on Plaintiff's ability to do work-related activities. (R. 323). Dr. Kamens completed a second questionnaire in September 2010, diagnosing Plaintiff with COPD and indicating that he was seeing pulmonologist Dr. Castellanos. (R. 332). The second questionnaire contained no further statements. (R. 332-33).

Dr. Kamens submitted a letter for the record dated January 10, 2011. The letter lists Plaintiff's medical impairments and expresses the following opinion: "Unfortunately [Plaintiff's] severe lung disease and other medical conditions has [sic] rendered him unable to work in any capacity. In my opinion, he is both physically and emotionally disabled and will never return to a state of wellness." (R. 378).

### *(4) Letter from Noreen Conlon, LMHC, and Linda LePoer, CNS*

Noreen Conlon and Linda LePoer submitted a letter for the record dated January 16, 2012, explaining that they have been seeing Plaintiff for "long overdue psychological counseling and treatment." (R. 380). The letter explains that Plaintiff's COPD and Barrett's disease are severe and debilitating, and that he has suffered from "advanced anxiety and severe depression for a period of several years." *Id.* The letter opines that these conditions "render him essentially disabled from working." (R. 380-81). The letter is not accompanied by treatment notes.

### *Hearing Testimony*

At the video hearing on March 5, 2012, Plaintiff testified about his education and employment history, his medical conditions, and the extent of impairment he faces as a result of his poor health. Plaintiff's primary health concern is his COPD. He believes he acquired COPD as a result of working with hazardous materials at his warehouse job without a respirator. (R. 35). Plaintiff uses inhalers to manage the COPD, and has not required emergency treatment for his breathing problems. (R. 35-36). However, Plaintiff reported experiencing a "crisis" with respect to his breathing on a daily basis. *Id.* He testified that he feels pain and pressure in his chest, is unable to run a mile, and is able to use an elliptical machine for only 5-7 minutes. (R. 40, 36). Plaintiff is able to do his laundry, but requires taking a break after going up and down stairs to catch his breath. (R. 37). Unable to walk long distances, Plaintiff purchased a "quad" vehicle so he could go hunting, but was forced to sell it for financial reasons. (R. 43-44). At the time of the hearing, Plaintiff had not been hunting for two years. (R. 43) Plaintiff testified that his respiratory problems are exacerbated by cold temperatures, (R. 44), and humidity during the summer. (R. 47-48).

Plaintiff also testified about his Barrett's Esophagus, which he has struggled with for many years. (R. 38). Plaintiff's gastrointestinal condition forces him to avoid eating and causes severe diarrhea. (R. 38-39). One reason why Plaintiff no longer walks long distances is because he is afraid he'll be unable to reach a bathroom before his diarrhea sets in. (R. 45). He reported getting cramps daily that feel like "a kick to the groin." *Id*. On a normal day, he'll spend an hour in the bathroom. *Id*. Two to three days a week, though, he will spend over two hours in the bathroom. (R. 46). Plaintiff testified that he takes stomach medication daily, which causes nausea and dizziness. (R. 41). He also testified that he undergoes testing every two years to monitor his Barrett's Esophagus. (R. 38).

Plaintiff also reported suffering from depression, and that he began seeking treatment for his depression in June 2011. (R. 39). Plaintiff stated that he was seeing a therapist every two weeks. He takes depression medication, which also causes nausea. (R. 39, 45). He had not been hospitalized as a result of his mental health condition. *Id*. Plaintiff testified that he washes his own clothes, that he bathes, grooms, and dresses himself, and that he pays his own bills. (R. 42).

Following Plaintiff's testimony, the ALJ examined vocational expert Elaine Cogliano. The ALJ posed three hypothetical questions to the vocational expert, asking her to consider an individual of the same age, education, and work experience as Plaintiff. (R. 56). First, the ALJ asked whether such an individual would be able to perform Plaintiff's past job or other jobs existing in the local or national economy, if that individual was limited to "light work" as defined in 20 C.F.R. § 404.1567(b), with the following additional limitations: the individual could not have more than incidental exposure to extremes of cold, heat, humidity, fumes, dusts or gases; the individual could not work at heights, using ladders, ropes, or scaffolding; the individual could not engage in more than occasional crouching, crawling, kneeling, or use of ramps and

stairs; the individual could not engage in lifting or reaching. *Id.* The vocational expert testified that such an individual could not perform Plaintiff's past job, but could perform other jobs in the local and national economy, such as information clerk, security guard/desk attendant, and assembler in a clean environment. *Id*. Second, the ALJ asked the vocational expert whether the same hypothetical individual could perform jobs in the local and national economy if limited to "sedentary" work as defined in 20 C.F.R. § 404.1567(a), involving only simple and unskilled tasks, within 200 yards of restroom facilities. (R. 57) The vocational expert responded that such an individual could perform jobs in the local and national economy such as a surveillance system monitor, inspector, or assembler. *Id.* Finally, the ALJ asked the vocational expert to assume the following additional limitations: the individual requires being off-task for 33 percent of the workday due to chronic shortness of breath and gastrointestinal symptoms. *Id.* The vocational expert testified that no jobs would be available for an individual with those limitations. *Id.*

### *The ALJ's Findings*

To be found eligible for disability insurance benefits, an applicant must prove that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). The Commissioner uses a five-step evaluation process to determine whether an applicant meets this standard. 20 C.F.R. § 404.1520 (a)(4). At step one, the Commissioner decides whether the applicant is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520 (a)(4)(i). If not, the Commissioner proceeds to step two. Step two requires the Commissioner to determine whether the applicant's impairment is "severe." 20 C.F.R. § 404.1520 (a)(4)(ii). If the claimant establishes that the impairment is

9

severe, the Commissioner proceeds to step three and determines whether the impairment meets or equals one of the listings in the Listing of Impairments, 20 C.F.R. § 404, subpart P, Appendix 1. 20 C.F.R. § 404.1520 (a)(4)(iii). If so, the claimant is conclusively presumed to be disabled. *See Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). If not, the Commissioner proceeds to step four. Step four asks whether the applicant's residual functional capacity (RFC) allows her to perform her past relevant work. 20 C.F.R. § 404.1520 (a)(4)(iv). If the claimant is capable of performing past relevant work, he or she is not disabled. If the claimant is unable to perform past relevant work, the burden shifts to the Commissioner on the fifth step to prove that the claimant "is able to perform other work in the national economy in view of [the claimant's] age, education, and work experience." *Bowen*, 482 U.S. at 142, 107 S.Ct. 2287. If the Commissioner fails to meet this burden, the claimant is disabled and is entitled to benefits. *Id.*

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity since the alleged onset date of August 31, 2005. (R. 18). At step two, the ALJ found that Plaintiff had the following severe impairments: Barrett's Epithelium (gastroesophogeal reflux disease, or "GERD") and chronic obstructive pulmonary disease (COPD) with a history of chemical exposure. *Id*. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listings in the Listing of Impairments. (R. 18). At step four, the ALJ determined that Plaintiff's RFC enabled him to perform light work as defined in 20 C.F.R. § 404.1567(b),[1] with the following

---

[1] The regulations define light work as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567.

additional limitations: no more than incidental exposure to extreme cold, heat, humidity, dust, fumes; no work at height or using ladders, ropes, scaffolding; no greater than occasional use of ramps, stooping, crawling, and kneeling; and no overhead lifting or reaching. (R. 19). Given Plaintiff's RFC, the ALJ found that Plaintiff was unable to perform his past work. (R. 21). At step five, however, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform jobs that exist in significant numbers in the national economy. (R. 22). Therefore, Plaintiff was not disabled. (R. 23).

In making the determination about Plaintiff's RFC, the ALJ concluded that although Plaintiff's impairment could reasonably be expected to cause the alleged symptoms, Plaintiff's statements regarding the intensity, persistence, and limiting effects of the impairments were not credible. (R. 21). Specifically, the ALJ found that the medical records, clinical findings, and Plaintiff's own reports regarding his daily activities were inconsistent with the severity of impairment alleged. *Id.* The ALJ noted that Plaintiff's treatment regimen for his GERD and COPD had been "relatively conservative and unremarkable." *Id.*

Of the three opinion letters submitted by Plaintiff's treating doctors, the ALJ explained the weight given to two of them. The ALJ did not give controlling weight to Dr. Kamens' medical opinion that Plaintiff was disabled and unable to work because the opinion was "not supported by the longitudinal objective record." *Id.* The ALJ gave "little weight" to the opinion of Plaintiff's mental health counselors because it appeared to credit subjective physical complaints which are outside the therapists' realm of expertise. *Id.* The ALJ did not indicate how he weighed Dr. Castellanos' opinion that Plaintiff's inability to tolerate medical treatments had led to "chronic inactivity and a poor functional status."

11

**Discussion**

Plaintiff raises a single claim of error. Plaintiff argues the Commissioner's decision should be reversed because the ALJ misapplied the law when he did not give controlling weight to the medical opinions of both Dr. Kamens and Dr. Castellanos in accordance with the "treating source rule."

*Standard of Review*

Review by this Court is limited to whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner applied the correct legal standards. *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); *see also Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The reviewing court must also consider whether the proper legal standard was applied. "Failure of the [ALJ] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [ALJ] applied the correct legal standards are grounds for reversal." *Weiler v. Shalala*, 922 F. Supp. 689, 694 (D. Mass. 1996) (citing *Wiggins v. Schweiker*, 679, F.2d 1387, 1389 (11th Cir. 1982)).

*Analysis*

Plaintiff argues that the ALJ misapplied the law by failing to give controlling weight to the opinions of Dr. Kamens and Dr. Castellanos. The treating source rule provides that the ALJ should give "more weight" to the opinions of treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2). "Controlling weight" is the term used to describe a medical opinion from a treating source that *must* be adopted by the ALJ. SSR 96-2p, 1996 WL 374188, at *2. Controlling weight will be afforded a treating physician's opinion on the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2).

In certain circumstances, however, the ALJ does not have to give a treating physician's opinion controlling weight. *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991) ("The law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians."). The relevant regulations allow the ALJ to discount the weight given to a treating source opinion where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians. *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004); 20 C.F.R. § 404.1527(c)(2)-(4); *see also* SSR 96-2p, 1996 WL 374188, at *2. Where controlling weight is not given to a treating source opinion, the ALJ considers an array of factors to determine what weight to grant the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the degree to which the opinion can be supported by relevant evidence, and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(2)-(6).

Under the regulations, the ALJ is *required* to explain the weight given to a treating source opinion and the reasons supporting that decision. 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating

source's opinion."). According to agency policy, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2P, 1996 WL 374188, at *5.

*ALJ's Consideration of Dr. Castellanos' Opinion*

In a letter dated November 28, 2011, Dr. Castellanos wrote:

I have attempted to treat [Plaintiff] with multiple medications including inhaled steroids, long acting beta agonist and anti-cholinergic agents however he has developed very unpleasant side effects and these treatments have not been well tolerated, therefore his chronic complaints have led chronic inactivity and a poor functional status.

In his decision denying Plaintiff's application for benefits, the ALJ referenced the contents of Dr. Castellanos' letter, but did not indicate how he weighed the medical opinion that Plaintiff's COPD was severe enough to cause "chronic inactivity." This omission was legal error. The ALJ must provide "good reasons" for the weight given to a treating source's opinion. *See* 20 C.F.R. § 404.1527(c)(2); SSR 96-2P, 1996 WL 374188, at *5. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights. It is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [ ]he is not.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). The requirement also ensures that a reviewing court can meaningfully review the ALJ's application of the treating source rule. *Wilson*, 378 F.3d at 544. *See also Brunel v. Comm'r, Soc. Sec. Admin.*, 248 F.3d 1126 (1st Cir. 2000) (finding that an ALJ's failure to explain why he discredited an evaluation from a treating physician to be "serious error"); *Halloran v. Barnhart*, 362 F.3d 28, 33

14

(2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

The Commissioner does not contest that the letter sent by Dr. Castellanos meets the definition of a medical opinion from a treating source under 20 C.F.R. § 404.1527(a) and 20 C.F.R. § 404.1502.[2] The treating source rule requires the ALJ to indicate the weight given to Dr. Castellanos' opinion and provide "good reasons" for that decision. The ALJ did neither. The "good reasons" requirement enables courts to adequately review the Commissioner's findings and allows claimants to understand why their application for benefits was denied. The omission of good reasons in this case is particularly troubling in light of the fact that there is at least some indication from Dr. Castellanos' treatment notes that Plaintiff had experienced worsening COPD symptoms in 2010 and 2011.[3] Further, the hearing transcript shows that Plaintiff's counsel expressly asked the ALJ to consider Dr. Castellanos' records—presumably because counsel considered the records from Plaintiff's pulmonary specialist to be powerful evidence of Plaintiff's disability. Yet the decision makes no effort to explain how the ALJ evaluated Dr. Castellanos' opinion. By not indicating the weight given to Dr. Castellanos' opinion and the reasons for that

---

[2] The regulation defines medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a). A treating source is "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. An ongoing treatment relationship exists "when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." *Id.*

[3] Records of Plaintiff's visit to Dr. Castellanos in August 2010 indicate that Plaintiff's COPD symptoms became more severe as a result of summer humidity and that he was using his rescue inhaler "very frequently." (R. 343). One month later, his symptoms began to improve. (R. 344). Plaintiff attributed the improvement to cooler weather. *Id.* However, Plaintiff's next visit to Dr. Castellanos in January 2011 indicated that his shortness of breath, nasal congestion, and wheezing had all worsened. (R. 375).

weight, the ALJ failed "to provide the reviewing court with the sufficient basis to determine that . . . the correct legal standard" was applied. *Weiler v. Shalala*, 922 F. Supp. 689, 694 (D. Mass. 1996).

*ALJ's Consideration of Dr. Kamens' Opinion*

The ALJ's consideration of Dr. Kamens' opinion is also inadequate.

Dr. Kamens' letter from January 10, 2011, states:

Unfortunately [Plaintiff's] severe lung disease and other medical conditions has [sic] rendered him unable to work in any capacity. In my opinion, he is both physically and emotionally disabled and will never return to a state of wellness.

The ALJ found that this opinion was not supported by the longitudinal objective record, and therefore did not give it controlling weight pursuant to 20 C.F.R. § 404.1527(c)(2). However, other than to say that the opinion "is not given controlling weight," the ALJ did not indicate how he evaluated it.[4] 20 C.F.R. § 404.1527(c)(2) provides that where an ALJ does not give a treating source opinion "controlling weight," it must apply the factors listed in paragraphs (c)(2)-(6) "in determining the weight to give the opinion." Those factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the consistency of the opinion with the record, supporting evidence for the opinion, whether the opinion is from a specialist, and other factors. *See* 20 C.F.R. § 404.1527(c)(2)-(6).

In support of his decision to not give the opinion controlling weight, the ALJ cites two facts: certain medical records suggested that Plaintiff's symptoms were manageable with basic prescriptions, and Plaintiff used a "quad" vehicle to go hunting up until two years before the hearing. A third piece of evidence cited by the ALJ to support discounting Dr. Kamens' opinion,

---

[4] The Commissioner correctly notes that treating source opinions on issues reserved to the Commissioner, such as whether a claimant is "disabled" or "unable to work" can never be given controlling weight or special significance. *See* SSR 96-5P, 1996 WL 374183 at *3. However, the same regulation provides that "opinions from any medical source on issues reserved to the Commissioner must never be ignored," and that "the adjudicator is required to evaluate all evidence in the case record . . . including opinions from medical sources about issues reserved to the Commissioner." *Id.*

16

that "the treating physician indicated he had not seen the claimant since 2006, but now alleges the claimant would have to leave work 1-2 times a week," is based on an erroneous reading of the record. The index to the record shows that the physician who had not seen Plaintiff since 2006 was Dr. Robert Terlato, and the persons who stated that Plaintiff would have to leave work 1-2 times a week were Noreen Conlon and Linda LePoer, the mental health counselors. None of those individuals, of course, were Dr. Kamens.

While the ALJ's observations regarding Plaintiff's hunting and medical records may support the conclusion that Dr. Kamens' opinion is not consistent with the record, they are unrelated to the other factors listed in 404.1527(c)(2)-(6). This sparse explanation for the weight given to the opinion of Plaintiff's primary care doctor makes it unclear whether and how the ALJ considered the other factors set forth in the regulation. This is grounds for reversal, because the explanation fails "to provide the reviewing court with the sufficient basis to determine that . . . the correct legal standard" was applied. *Weiler v. Shalala*, 922 F. Supp. 689, 694 (D. Mass. 1996). *See Oberg v. Astrue*, No. 1:10-CV-11756-PBS, 2012 WL 689339 (D. Mass. Mar. 1, 2012) (remanding where, although the ALJ considered whether the treating physician's opinion was consistent with the record, there was "insufficient evidence that the ALJ considered the four remaining § 404.1527(d) factors[5] . . . and applied the treating physician rule").

---

[5] Prior to the last amendment of § 404.1527, the factors to be considered by an ALJ in deciding the weight to give a medical opinion were listed in § 404.1527(d). In 2012, however, paragraph (c) was removed. Thus, the factors are now listed in § 404.1527(c). *See* How We Collect and Consider Evidence of Disability, 77 FR 10651-01 at *10656.

## **Conclusion**

For the reasons set forth above, Plaintiff's Motion to Reverse and Remand the Decision of the Social Security Administration (Docket No. 16) is ***granted*** and Defendant's Motion to Affirm the Commissioner's Decision (Docket No. 20) is ***denied.*** The case is remanded to the ALJ for further proceedings consistent with this opinion.

SO ORDERED.

/s/ ***Timothy S. Hillman***
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**